UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* MARSHA TURNER and CAROLYN SWARTOS, | |
| Plaintiffs, | Case No. 03-cv-4219-JPG |
| v. | |
| MICHAELIS JACKSON & ASSOCIATES, L.L.C., an Illinois limited liability company, d/b/a Jackson Vision & Laser Centers, and MICHAELIS BILLY JACKSON, M.D., | |
| Defendants. | |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

This matter is before the Court on defendants' motion to dismiss (Doc. 49), to which relators have responded (Doc. 56) and defendants replied (Doc. 57). For the following reasons, the Court will **GRANT IN PART AND DENY IN PART** defendants' motion.

**BACKGROUND**

On December 12, 2003, Relators Marsha Turner (Turner) and Carolyn Swartos (Swartos) (collectively relators) filed their original complaint (Doc. 1) against Michaelis Jackson & Associates L.L.C. (the Practice) and Michaelis Jackson (Jackson), alleging numerous violations of the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq*. Relators subsequently filed an amended complaint (Doc. 25) on February 22, 2006, which the Court unsealed, along with the original complaint, on May 15, 2006. Relators' amended complaint is 65 pages long and contains 221 numbered paragraphs.

Jackson is an ophthalmologist and the sole member and manager of the Practice, which

does business as Jackson Vision & Laser Centers in Southern Illinois. Turner is a former employee of the Practice who assisted with various administrative duties (including, as will become important, billing) and Swartos is the former proprietor of a medical practice consulting group called Logos Management Group (Logos), which audited the Practice's medical records in July 1999. (Amend. Compl. at. 3). Relators contend defendants violated the FCA by presenting fraudulent claims to Medicare and making false statements to get these claims paid. Specifically, Count I alleges defendants billed for diagnostic exams Jackson did not perform, Count II alleges defendants submitted bills for extended and subsequent ophthalmoscopies that Jackson did not perform, Count III alleges defendants falsified medical records to support medical services Jackson did not provide, Count IV alleges defendants used false records to support cataract surgeries that were not medically necessary, Count V alleges defendants fraudulently manipulated the scheduling of post-surgical follow-up visits so that they could bill Medicare for services that should been covered by previous payments, Count VI alleges Jackson fraudulently induced some of his patients to receive an unwarranted post-cataract-surgery procedure (called a YAG Capsulotomy) and Count VII alleges defendants engaged in "upcoding," meaning, roughly, that they billed Medicare for higher levels of service than actually provided. Defendants move for dismissal of all of these claims pursuant to Federal Rule of Civil Procedure 9(b).

## ANALYSIS

FCA claims must be pleaded in accordance with Rule 9(b). *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). Under this Rule, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." As observed in *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990),

"[t]his means the who, what, when, where, and how: the first paragraph of any newspaper story." Generally, this means, "facts such as the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff [must] be alleged in detail." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (internal quotation marks omitted).

Relators bring their claims pursuant to 31 U.S.C. §§ 3729(a)(1), & (2), which impose liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" or any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

### I. Count I

In terms of relators' method of pleading, Count I is representative of Counts II, IV, VI and VII. Factually, it centers on a diagnostic test called a Gonioscopy, which ophthalmologists use to detect glaucoma.[1] An ophthalmologist can only perform this test by using a Gonioscopy lens or an instrument called a Zeiss Four Mirror; the test cannot be performed without using one of the two. In his practice, Jackson "routinely" tells his patients he performs a Gonioscopy, but uses neither device. (Amend. Compl. at 8). Instead, he only "look[s] at the patient's eye through a slit lamp for a brief moment." (*Id*. at 9).

> 38. [Jackson] caused the records of his Medicare patients to be marked with Gonioscopy results to indicate that a Gonioscopy was performed when no Gonioscopy was performed. For example:
>
> A) On March 23, 2001, Patient 1, a non-glaucoma patient, underwent an examination by [Jackson]. Patient 1's medical record indicates a

---

[1] The Court takes all relators' well-pleaded allegations as true.

> Gonioscopy was performed; however, no Gonio Lens or Four Mirror was used . . . . [Jackson] dictated [the] results . . . as if he used a Gonio Lens or Four Mirror . . .

(Amend. Comp. at 9-10).[2]  Count I goes on to allege generally that Jackson "would mark the patient's Super Bill, the patient charge sheet, to reflect that a Gonioscopy had been performed," that defendants billed Medicare for Gonioscopies Jackson did not perform, that defendants submitted claims for reimbursement for these procedures to Medicare and that Medicare paid the claims. (*Id*. at 11, 13).  Depending on the year, Jackson submitted from five to forty-seven times as many Gonioscopy claims to Medicare than did similar ophthalmologists in the area.

The crux of defendants' claim is relators' failure to allege "that a bill was submitted to the government for these patients, that the government paid any such bill, and . . . how much the government paid." (Defs.' Mem. Supp. Mot. Dism. at 3).[3]  They reject the contention that relators can make up for this deficiency by showing Jackson submitted more Goniospopy claims to Medicare than his similarly situated colleagues.

As relators see it, defendants are essentially complaining that they did not plead "the what" of the fraud. They disagree that they must allege specific claim numbers, dates or amounts paid to comply with Rule 9(b) and contend that so long as their allegations put defendants on notice of the nature of their claims they comply with the spirit of the Rule.  They assert that the detail with which they describe defendants' fraud and their statistical evidence give defendants sufficient information to prepare a defense.

---

[2] Relators attached Patient 1's record to the amended complaint.

[3] Defendants first suggest that Count I fails because relators have failed to allege that Patients 1, 2, and 3 were Medicare patients.  While the Court agrees that relators were not as deliberate as they might have been on this point, they have sufficiently pleaded that these patients were Medicare patients.

The Seventh Circuit has not specifically addressed the amount of detail a relator must allege when she claims that a defendant defrauds the government on a massive scale over a number of years. In several recent cases, however, it has upheld the dismissal of *qui tam* complaints when the relator has failed to "link" her allegations of fraud "to any claim for payment." *Garst*, 328 F.3d at 378; *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601 (7th Cir. 2005). Several of its sibling Circuits have specifically identified the kind of detail required in cases such as this.

In *United States ex rel. Clausen v. Laboratory Corporation of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002), the relator alleged that Laboratory Corporation of America, Inc. (LabCorp) defrauded the government by performing unauthorized or excessive tests on individuals in long-term care facilities. *Id*. at 1302-03. In pleading his claims, the relator detailed the precise nature of the scheme (citing his conversations with LabCorp employees about its policies, among other things), attached the form LabCorp would have submitted to Medicare (the HCFA Form-1500) and detailed the testing histories of three patients at two specific facilities with which the LabCorp contracted. *Id*. at 1305-06. He alleged that LabCorp electronically submitted the Form-1500 on the date it provided the service or within a few days thereafter. *Id*. at 1306. The relator failed, however, to attach a bill, claim, Form-1500 or payment and failed to identify the amount of any charge or the date of any claim.

The court found that relator's failure "to allege with any specificity if – or when – any actual improper claims were submitted to the Government [was] . . . fatal." *Id*. at 1311. Stating that bills were submitted "on the date of service or within a few days thereafter" was insufficient. *Id*. at 1312-13 ("If Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion.").

The First Circuit has held that Rule 9(b) requires a relator to "provide details that identify particular false claims for payment that were submitted to the government." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004). Some of these details include:

> the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices.

*Id*. at 233. The Tenth Circuit explicitly adopted this rationale in *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727-28 (10th Cir. 2006), and the Sixth and Eighth Circuits have recently held similarly. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006); *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552 (8th Cir 2006). The point of all these cases is that the actual "presentment" of a false claim is not simply "a ministerial act, but the *sine qua non* of a False Claims Act violation." *Clausen*, 290 F.3d at 1311.

In support of their contention that the rule in this Circuit is different, relators cite to *United States ex rel. Yannacopolous v. General Dynamics*, 315 F.Supp.2d 939, 945 (N.D. Ill. 2004). There, the court held that the relator did not have to allege, or cite to, "actual false claims" or to the specific dates when the fraudulent activity occurred. *Id*. at 945. While *Yannacopolous* is not the only case to so hold, see *United States ex rel. Salmeron v. Enter. Recovery Sys., Inc.*, No. 05-C-4453, 2006 WL 3445579, at *2 (N.D. Ill. Nov. 30, 2006), many more courts have held that some specifics or representative examples are necessary to comply with Rule 9(b). *United States ex rel. Fowler v. Caremark RX, Inc.*, No. 03-C-8714, 2006 WL 1519567, at *2-3 (N.D. Ill. May 30, 2006); *United States ex rel. Raymer v. Univ. of Chicago*

*Hosps.*, No. 03-C-806, 2006 WL 516577, at *9 (N.D. Ill. Feb. 28, 2006); *Peterson v. Comty. Gen. Hosp.*, No. 01-C-50356, 2003 WL 262515, at *2 (N.D. Ill. Feb. 7, 2003) ("To be clear, the court does not expect relator to list every single patient, claim, or document involved, but he must provide at least some representative examples."); *United States ex rel. Obert-Hong v. Advocate Health Care*, No. 99-C-5806, 2001 WL 303692, at *3 (N.D. Ill. Mar. 28, 2001) (finding that relator must provide some representative examples).

By requiring the who, what, where and when of the alleged fraud, Rule 9(b) requires the plaintiff "to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). When a complaint alleges numerous instances of fraud over a multi-year period, however, it would be both impractical and inefficient to require detailed allegations of the who, what, when, where and how of every single submission of a false claim. *See, e.g., United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir.2001); *Salmeron*, 2006 WL 3445579, at *2. A solution responsive to both sets of concerns, and to both Rule 8 and Rule 9, is to require at least a few representative examples. *Peterson*, 2003 WL 262515, at *2; *Obert-Hong*, 2001 WL 303692, at *3. This, of course, provides the "link" between the allegations of deceit and an actual claim for payment. *See Gross*, 415 F.3d at 605. Though the relators have alleged the underlying scheme in detail, they have failed to link these allegations with an actual claim for payment because they have failed to allege specifically that defendants submitted a claim for payment for Patients 1, 2 and 3, the date they submitted the claims, the date Medicare processed them and the amounts Medicare paid. Of course, this conclusion means that their general allegations in this claim are insufficient as well.

The Court also rejects their use of statistics to make up for these deficiencies. Simply

showing that Jackson submitted many more claims than similar situated physicians does not link his alleged fraud with an actual claim for payment. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir 1997); *see also United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (ruling similarly on summary judgment).

## II.     Counts II, IV, VI and VII

It is not necessary to detail the schemes alleged in these Counts any further.  Like Count I, they adequately describe the underlying fraud (in varying degrees of exactitude) but completely omit allegations linking the fraud to actual claims for payment.

## III.    Counts III

Count III stems from information acquired by Swartos when her company, Logos, reviewed the Practice's medical records.  Logos's review, which took place in July 1999, apparently focused on the Practice's "coding" of its medical records.[4]  Though it is standard practice in the industry to review a random sample of patient charts, Logos reviewed fifteen charts specifically chosen by Jackson.  In its summary of its findings – the Medical Record Coding Review (the Review), which relators attached to the Amended Complaint as Exhibit G – Logos concluded that the Practice's records were missing, among other things, medical histories,

---

[4] The Center for Medicare and Medicaid Services mandates that providers use the Physicians' Current Procedural Terminology manual codes (CPTs), "which are based on criteria established by the American Medical Association . . . to indicate the medical services rendered when submitting claims to [private insurers that contract to handle Medicare claims]." (Amend. Compl. at 5).  In order to obtain payment from Medicare for performing procedures, a patient's medical chart must contain "documentation regarding items such as the patient's medical history, complaints, symptoms [and] clinical examination results." (*Id*. at 6).  If the patient's medical chart does not contain the documentation to support the billing of the CPT Code billed, Medicare will recoup the payment it made.  (*Id*. at 7).

reviews of systems, family histories, social histories and optical readings. If Medicare had audited the Practice, the missing information would have been necessary to justify billing pursuant to a specific billing code. Logos determined that 33% of the 15 visits had not been coded in accordance with Medicare regulations and that all the patients' records had been upcoded, which "is billing for a CPT Code that requires more medical service than those provided." (*Id*.). When Swartos met with Jackson to discuss Logos's findings, she told him that Medicare does not allow providers to supplement a patient's medical record after a visit to indicate performance of other further services on a particular examination date. Despite this admonition, Jackson instructed his Ophthalmic Assistants, Donna Cobin and Cheryl Formel, to fill in the information that was necessary to support the upcoding. (*Id*. at 25).[5] Cobin and Formel changed records for approximately 75% of the 2500 patients Jackson saw between April 1999 and July 1999. Starting July 1, 1999, Jackson told Cobin and Formel to supply any information necessary to support the CPT code actually billed at the end of each day. Relators allege generally that defendants provided services to patients covered by Medicare from April 1999 to the present, that they had subordinates change the patients' medical records as alleged above, that they submitted claims for these patients on Form-1500s, and that Medicare paid the claims.

Defendants find fault with Count III on two levels. First, they point out relators' failure to allege that they submitted bills and obtained payment for the services provided to the Medicare patients listed in the Review. Second, they claim relators have not provided enough detail to show what was false about the particular office visits listed. (Def.s Mem. Sup. Mtn. Dism. at

---

[5] "Each CPT Code utilized by a Medicare Provider has a specific set of clinical elements required to support billing for that specific CPT Code." (Amend. Compl. at 25).

13). At most, defendants think the Review shows that they did not comply with the regulations perfectly. As such "minor technical regulatory violations" do not make a claim false for purposes of Rule 9(b), they believe this claim must fail. *See Gross*, 415 F.3d at 604.

In dealing with the allegations in Count III, it is useful to look at the pre- and post-July 1999 fraud separately. With respect to the fraud before July 1999, relators allege that defendants "submitted claims for reimbursement on behalf of Medicare eligible patients whose medical charts were *later changed* by Cobin and Formel . . . to support the billing submitted by" defendants. (Amend. Compl. at 26) (emphasis added). The parties have not briefed whether fraud committed after the submission of a claim is actionable under the FCA, but a review of the plain language of 31 U.S.C. §§ 3729(a)(1), & (2) suggests that it is not. But even assuming that it is, alleging that "[a]t least 75%" of these records were changed, without specifically identifying the 75% is nothing more than a conclusory allegation. *See Joshi*, 441 F.3d at 556. As relators have not alleged that Cobin and Formel changed the records of the patients listed in the Review, the specifics therein do not cure the failure. Relators have not pleaded when defendants submitted bills for the patients pre-July 1999 or, specifically, why the claims submitted were false. Without identifying at least one patient for whom the defendants billed Medicare or any more specifics as to at least one claim, relators cannot link the fraud with any specific claim. The nature of the failings in the Review supports this conclusion. The types of violations listed in the report include: "Illegible initials," "Illegible documentation" and "Illegible signature." While going back to the reports and making signatures and initials legible might be a violation of a regulation, it is hard to see how something like this, in itself, would amount to fraud.

As to the post-July 1999 fraud, relators allege that "From July 1, 1999, to the present, the

Scribes and/or other Practice employees have *routinely* reviewed each days' Super Bills with the patients' respective medical chart [sic] and added information to the medical chart to insure that the billed procedure was supported by the medical chart." (Amend. Compl. 26) (emphasis added). Specifically, Cobin and Formel "inserted . . . missing information" to support the charges "without confirming with [Jackson] that the added procedures had been performed." (*Id*. at 26). Alleging that defendants' employees "routinely" changed medical records could mean one of two things: that defendants changed records sometimes or that they changed them all the time. Either way, this set of allegations fails for all the reasons the allegations in Count I failed. With respect to the latter, relators cannot make an end-run around the particularity requirement by alleging that every single record (and therefore every single claim submitted) was false. *See Joshi*, 441 F.3d at 557; *see also United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

IV.   **Count V**

Count V is based on defendants' manipulation of Medicare's global billing system. Under this system, Medicare reimburses physicians "under codes which are intended to reimburse not only the surgery itself but also for certain pre-operative, intra-operative, and post-operative services that are related to the surgery." (Amend. Compl. at 40). The global period for surgery begins the day before surgery and continues for the next 90 days; during that period, the surgeon must perform all follow-up examinations at no additional charge. When Jackson performs cataract surgery on a patient, he requires his patients to undergo three post-operative exams: the first one week after the procedure, the second three weeks after the procedure and the third at least 91 days after the procedure. By scheduling the third of his follow up examinations at least 90 days after the surgery, he was able to obtain payment for that examination that he

11

would not have if he had it scheduled within the 90-day period. Relators specifically identify three patients – Patients 4, 5, and 6 – with whom Jackson's staff scheduled an examination more than three months after surgery.

Defendants argue that relators have not alleged that they did anything false. They point out that the applicable section of the Medicare manual, § 4821, only states that the "Global Billing Package" includes "Follow-up visits during the postoperative period of the surgery [the 90 days] that are related to recovery from the surgery," and does not *require* all follow-ups to be scheduled within the 90-day period. Further, they claim relators have "fail[ed] to put forth the actual patient visits for the enumerated patients that would identify that the nature of the visit was post-operative rather than a new problem." (Def.'s Rply. at 5). Relators rejoin by simply stating that their pleading gives Defendants notice of their claim.

Though relators' arguments on this point are unclear, the Court finds that they have pleaded this count with the requisite particularity. In their Amended Complaint, relators allege that after every cataract surgery Jackson had his staff schedule an appointment at least three months after the procedure "for the purpose of evaluation and treatment of the patient following Cataract Surgery." (Amend. Compl. at 41). As post-surgical follow-up procedures, they should have been billed under CPT 66984. Jackson billed all these follow-ups as unrelated examinations under CPT 99213 and CPT 92012. Relators have provided specific allegations, backed up by Medicare documents, which put defendants on notice of precise nature of the alleged scheme and point them to a specific example of this conduct. Patient 4 had cataract surgery on May 30, 2000 and her third follow-up on September 5, 2000 – 98 days later. (Amend. Compl. Ex. C-4). Though it was a follow up, defendants billed Medicare for an unrelated examination under CPT 99213. Medicare processed the claim on September 18, 2000

and paid defendants $35.05.

Contrary to defendants' assertions, relators have shown why the bill submitted to Medicare was false: it was billed pursuant to CPT 99213 rather than CPT 66984. While the Court accepts defendants' claim that post-surgical follow-ups are not included in the global billing package – which is to say defendants could have received payment for them if they had billed them as follow-ups – it does not necessarily follow that intentionally billing them under the wrong code was somehow not fraudulent or merely a technical regulatory violation. Without more, the Court might just as well assume that Medicare would have objected in some way to defendants' routine scheduling of follow-up procedures just outside the 90-day threshold. Defendants are correct that Jackson's manipulation alone would not be sufficient to state claim, but when that manipulation is coupled with a false statement, the situation is meaningfully different. Accordingly, the Court **DENIES** defendants' motion to dismiss with respect to Count V.

## CONCLUSION

The Court **GRANTS** defendants' motion to dismiss (Doc. 49) as to all Counts save Count V. With respect to that Count, the Court **DENIES** the motion.

**IT IS SO ORDERED.**

**DATED: February 13, 2007**

                                  s/ J. Phil Gilbert  
                                  **J. PHIL GILBERT**  
                                  **DISTRICT JUDGE**