UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, *ex rel.*,
MARSHA TURNER and CAROLYN
SWARTOS,

                Plaintiffs,

      v.                                    Case No. 03-cv-4219-JPG

MICHAELIS JACKSON & ASSOCIATES,
L.L.C., *an Illinois limited liability company*
*doing business as* Jackson Vision & Laser
Centers, L.L.C., and MICHAELIS BILLY
JACKSON, *M.D.*,

                Defendants.

## MEMORANDUM AND ORDER

       This matter comes before the Court on Defendants' Motion for Summary Judgment

(Doc. 144) and Memorandum in Support Thereof (Doc. 145). Relators filed a Response (Doc.

159) thereto, to which Defendants submitted a Reply (Doc. 160). After full briefing of the

summary judgment motion, Defendants made a Motion for Oral Argument (Doc. 162) thereon.

Defendants also filed a Motion for Sanctions (Docs. 168, 169), to which Relators submitted a

Response (Doc. 171) and Defendants filed a Reply (Doc. 180)

       For the following reasons, the Court, *inter alia*, **DENIES** Defendants' summary

judgment motion.

## BACKGROUND

       Brought at the close of 2003, this case has languished for over seven years. With an

impending trial date of January 18, 2011 "set in granite," Defendants filed the instant motion in a

final effort to have this case resolved by the Court rather than a jury.[1]  The meritoriousness of this effort will be analyzed following a detailed, yet as-succinct-as-possible, review of the case's facts and relevant procedural posture.

I.      **Facts**

In analyzing a motion for summary judgment, the reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The Court, construing the evidence and all reasonable inferences in the light most favorable to the non-movants, finds as follows:

Sometime in 1999, Relator Marsha Turner (hereinafter "Turner") began working as a receptionist and, eventually, the business manager at Defendant Michaelis Jackson & Associates, L.L.C. (hereinafter "the Practice").  The sole member and manager of the Practice is Defendant Dr. Michaelis Billy Jackson (hereinafter "Dr. Jackson"), a board-certified ophthalmologist. Relator Carolyn Swartos (hereinafter "Swartos"), the former proprietor of a medical consulting practicing group called Logos Management Group, worked as a private consultant that did billing and collection work for the Practice, including an audit of the Practice's medical records in 1999.

---

[1]Defendants filed the summary judgment motion during the week of the dispositive motions deadline.  In fact, the motion, filed on September 24, 2010, was submitted two days after said deadline had passed (September 22, 2010).  The Court admonishes counsel to adhere to any explicit deadlines, lest future submissions be stricken for untimeliness.

Over time, Turner and Swartos (hereinafter collectively referred to as "Relators") became convinced that Dr. Jackson and the Practice (hereinafter collectively referred to as "Defendants") were billing Medicare for procedures that were not being performed or that were medically unnecessary.  While Relators were never in an exam room when Dr. Jackson examined patients and were unfamiliar with the medical procedures that he performed, Turner's sister, Donna Cobin (hereinafter "Cobin"), substantiated their feelings of distrust.  Cobin could sometimes be found next to Dr. Jackson during an examination.  Cobin briefly worked at the Practice and became one of its certified ophthalmic assistants.

To understand Cobin's job as a certified ophthalmic assistant, the Court must briefly chronicle how appointments with the Practice were handled.  When one had an appointment with Dr. Jackson, there were typically two other individuals that met with the patient in the examination room.[2]  One of these individuals was a "tech," who put the patient in the room and conducted necessary preliminary testing, including visual acuity and brightness acuity tests by way of the Snellen eye chart.  The other individual was a "scribe," who took notes of the primary examination, including what Dr. Jackson called out while studying the patient's eyes at the slit lamp.  The scribe could not see what Dr. Jackson saw in the slit lamp.  Cobin routinely acted in either capacity and occasionally acted in both capacities.

Cobin bolstered Relators' suspicions of false billing with respect to the following four procedures: 1) gonioscopies; 2) extended ophthalmoscopies; 3) cataract surgeries; and 4) YAG laser procedures.  The billing of these four procedures from 1999 through 2003 is all that is at issue in this case.  In order for the parties and the Court to effectively review Dr. Jackson's

---

[2]The role of "tech" and "scribe" could be performed by the same individual, although this was not always the case.

billing of these procedures, only a sampling of Dr. Jackson's patient files are in dispute. Specifically, Relators hand-selected 200 of Dr. Jackson's patient records that they thought were most likely to show fraud, and 25 of these (hereinafter collectively referred to as "trial records" or "trial patients" and individually referred to as "Patient 1," "Patient 2," etc.) were randomly selected as a "probe sample" of the alleged misconduct.  The Court then bifurcated the case so it could first determine any liability with respect to the trial patients.

Limited to the medical records of the trial patients, Relators argue that they can show 29 false claims for gonioscopies, 167 false claims for extended ophthalmoscopies, 36 false claims for cataract surgeries, and 37 false claims for YAG laser capsulotomies.  Each of these procedures and Defendants' respective billing practices will be addressed in kind, including any relevant lay and expert witness testimony.

### A.     Gonioscopies

A gonioscopy is an "examination of the angle of the anterior chamber of the eye with the gonioscope [an optical instrument for examining the angle of the anterior chamber and for demonstrating ocular motility and rotation]."  *Dorland's Illustrated Medical Dictionary* 809 (31st ed. 2007).  The parties agree there is no regulation that governed the billing of gonioscopies during the relevant time frame.

In the early years of the Practice, Dr. Jackson did not know Medicare could be billed for gonioscopies, and he did not perform them.  When Dr. Jackson discovered a billing code existed for the procedure, however, he began to perform multiple gonioscopies a day.  Curious about the sharp rise in the number of gonioscopies, Turner asked Cobin if Dr. Jackson was indeed performing them, to which she responded that he actually performed very few.  Cobin knew this because, when acting as a scribe, she personally witnessed Dr. Jackson calling out results for

4

gonioscopies that he did not perform, although she could not remember if such impropriety occurred during a trial patient's examination.  Relators and Cobin are now of the opinion that Dr. Jackson billed Medicare for gonioscopies he did not in fact perform.

Dr. Andrew Dahl (hereinafter "Dr. Dahl"), a board-certified ophthalmologist that has performed countless gonioscopies, concurs with the opinion of Relators.  Unlike Dr. Stephen Kamenetzky (hereinafter "Dr. Kamenetzky") and Dr. Steven Williams (hereinafter "Dr. Williams"), both of whom are board-certified physicians specializing in ophthalmology, Dahl believes that "gonioscopy is not a – necessary to evaluate the overall health of every eye," Doc. 145-9, p. 9; in other words, a gonioscopy need not be performed as a matter of course.  In his review of Dr. Jackson's gonioscopy records, Dr. Dahl found that some medical impossibilities surrounded the recorded findings.  For example, the sample that Dr. Dahl reviewed should have contained at least some medical abnormalities, although Dr. Jackson recorded none.  Dr. Dahl also found 10 specific incidents in the 25 trial records where medical tests were recorded and billed *despite the patient never having visited Dr. Jackson's office on that date*.  This, of course, made Dr. Dahl question the medical record of those patients who *had* shown up for their appointments.  Dr. Dahl also opined on the medical necessity of some of the patient trial records. He testified that each of the 12 gonioscopies performed on Patient 9 and each of the 9 gonioscopies performed on Patient 25 lacked medical necessity; therefore, it was inappropriate to bill Medicare for them.

The opinions of Dr. Kamenetzky and Dr. Williams stand in stark contrast to those of Dr. Dahl, as they do not take issue with the gonioscopy records at issue.  This is perhaps most remarkable given that Relators retained Dr. Kamenetzky.

5

B.     **Extended Ophthalmoscopies**

An ophthalmoscopy is "the examination of the interior of the eye with the ophthalmoscope [an instrument containing a perforated mirror and lenses used to examine the interior of the eye]." *Dorland's Illustrated Medical Dictionary* 1350 (31st ed. 2007).  An extended ophthalmoscopy focuses on the posterior segment of the eye and allows a physician to monitor a patient for retinal tears and other abnormalities.  The parties have stipulated that no regulation governed this procedure in Illinois during the relevant time period.

Cobin maintains that, like gonioscopies, Dr. Jackson "wrote [extended ophthalmoscopies] down all the time but we didn't do them."  Doc. 159-7, p. 3.  She estimated that Dr. Jackson performed a "true" extended ophthalmoscopy only about 5% of the time that he indicated such a procedure had been performed.  With respect to the 25 trial patients, Cobin is confident that Dr. Jackson represented that he had performed a proper extended ophthalmoscopy on Patient 2 when he had in fact not done so.  She was otherwise unable to identify extended ophthalmoscopies claimed but not performed on *any* of Dr. Jackson's patients.

The parties' expert witnesses have differing views of the propriety of Dr. Jackson's claims for extended ophthalmoscopy.  Dr. Kamenetzky, who believes that the necessity of an extended ophthalmoscopy is a matter of medical judgment, found 22 of 25 of the trial extended ophthalmoscopies to be medically necessary.  He primarily took issue with the other 3 procedures due to insufficient or absent medical drawings in patients' files.  Of those 22, Dr. Dahl found only 3 to be medically necessary.  This is largely due to his belief that an extended ophthalmoscopy should not be billed if a patient has already undergone the procedure and there is no evidence of change.

6

Patient 7 is of particular concern to Dr. Dahl.  Despite the fact that Patient 7 did not experience significant vision changes, Dr. Jackson performed 10 extended ophthalmoscopies on said patient over a two-year period.  Dr. Dahl disputes the medical necessity of all of these procedures.  Finally, like Dr. Kamenetzky, Dr. Dahl found many of Dr. Jackson's extended ophthalmoscopy drawings to be insufficient for Medicare's purposes, especially Patients 7, 14, and 22, whose drawings were absent.

### C.    Cataract Surgeries

Cataract surgery is a procedure performed on a cataract, that is to say "a partial or complete opacity on or in the lens of the eye or the capsule of the lens, especially one impairing vision or causing blindness." *Dorland's Illustrated Medical Dictionary* 308 (31st ed. 2007). Surgery, which consists of removal of a cataract and replacement with an intra-ocular lens implant, becomes necessary when a cataract spreads into the visual axis of the eye where light reflects.  Unlike gonioscopies and extended ophthalmoscopies, the contractor for Medicare during the relevant time period did issue a regulation that governed the billing of cataract surgeries – ILMI-070.

Cobin occasionally acted as a scribe for the 25 trial patients that underwent cataract surgeries.  While, as always, Cobin deferred to the doctor's judgment as to the medical necessity of such surgeries, she was of the opinion that improper patient intake and faulty testing may have tainted Dr. Jackson's judgment.[3]  Cobin, however, agreed that she could not definitively testify on the issue with respect to the trial patients because she never acted as a tech during their visits.

---

[3]According to both Cobin and Turner, Dr. Jackson had instructed them to perform improper brightness acuity tests.  Specifically, he told them to only perform only high reading during a brightness acuity test and make up results for medium and low readings.

Relators' expert testimony is much more specific in terms of the trial patients. Although Dr. Kamenetzky did not opine on the cataract surgeries of the trial patients, Dr. Dahl stated that 25 of the 36 surgeries at issue did not carry the medical necessity to be billed to Medicare. Dr. Dahl, who has performed many of these surgeries over the course of his career, primarily bases his opinion upon the absence of sufficient visual acuity loss, the absence of refraction determination, and the lack of improvement following surgery. Dr. Williams essentially deferred to Dr. Jackson's medical judgment.

    **D.**    **YAG Laser Capsulotomies**

The irritation of cataract surgery sometimes causes inflammation and creates opacities of the membranes that surround one's intra-ocular lens implant. If clouding (i.e. fibrosis) occurs, a YAG laser capsulotomy may become necessary, whereby an ophthalmologist uses a YAG laser to create small holes in the capsule of the eye at the site of the implant. A capsulotomy is defined as "the incision of a capsule, such as of the lens, the kidney, or a joint." *Dorland's Illustrated Medical Dictionary* 290 (31st ed. 2007). A YAG laser capsulotomy seeks to improve the patient's vision. A regulation, ILMI-013, governed the billing of this procedure during *most* of the relevant time period, namely until its expiration on June 1, 2002.

Dr. Jackson told Cobin and some of the techs to encourage patients to consent to YAG laser capsulotomy regardless of necessity. While the general follow-up rate for a YAG laser capsulotomy is 30-45% of those individuals receiving cataract surgery, 100% of the trial patients who went under the knife for cataract surgery later underwent a YAG laser capsulotomy.

As with cataract surgery, Cobin sometimes served as a scribe for the 25 trial patients that underwent YAG laser capsulotomies. She stated that improper intake and unnecessary testing raises questions about Dr. Jackson's determination of medical necessity but that she could not

8

testify with certainty on the issue due to her non-tech status.

Dr. Dahl, who has performed many YAG laser capsulotomies, took issue with Dr. Jackson's submission of some capsulotomy claims for the same reasons as the doctor's cataract surgery billings.  It is important to note, however, that Dr. Dahl admitted his conclusions were based upon a regulation issued by National Government Services, Inc. that the parties have since stipulated does not apply to the capsulotomies at issue.  Meanwhile, Dr. Williams only reviewed a portion of the trial patient files for capsulotomy claims, and, again, he deferred to Dr. Jackson's judgment as a doctor.

## II.    Relevant Procedural Posture

On December 12, 2003, Turner, Swartos, and Cobin brought suit against Defendants in this Court.  Eventually, Cobin opted out of the lawsuit, and Relators filed the now-operative Second Amended Complaint (Doc. 68).

Relators' primary contention is that Defendants violated the False Claims Act, 31 U.S.C. § 3729, *et seq*., by presenting fraudulent claims to Medicare and making false statements to get the claims paid.  Specifically, Relators allege the following five counts: 1) Defendants billed for gonioscopy diagnostic exams that Dr. Jackson did not perform (Count I); 2) Defendants submitted bills for extended ophthalmoscopies that Dr. Jackson did not perform (Count II); 3) Defendants falsified medical records to induce payment for cataract surgeries (Count III); 4) Defendants billed cataract surgery and capsulotomy follow-up visits as new visits by purposefully scheduling them outside of accepted follow-up visit time frames (Count IV); and 5) Defendants fraudulently induced patients to undergo unwarranted capsulotomies (Count V). Over three years after the filing of the second amended complaint, Defendants now move for summary judgment pursuant to Federal rule of Civil Procedure 56.

ANALYSIS

## I.      Summary Judgment Generally

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.     False Claims Act

Relators bring suit pursuant to the False Claims Act (hereinafter "FCA" or "the Act"), 31 U.S.C. § 3729, *et seq*. Because one of the goals of the Act is "to encourage 'private individuals who are aware of fraud being perpetrated against the Government to bring such information forward,'" *Hindo v. Univ. of Health Scis./The Chi. Med. Sch.*, 65 F.3d 608, 612 (7th Cir. 1995) (citing H.R. Rep. No. 99-660, 22 (1986)), the FCA provides incentives and rewards to private citizens, commonly referred to as "relators," who pursue civil *qui tam* suits thereunder. "Since the Civil War, *qui tam* suits have been part of the FCA scheme for preventing fraud against the

10

federal government.  The basic idea is that a private citizen with *personal knowledge* of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail."  *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016-1017 (7th Cir. 1999) (emphasis added); *see* 31 U.S.C. § 3730(b),(d) (West 2010).  In fact, a relator's share of these proceeds can be quite "substantial," especially if the Government does not proceed with the private action under the FCA.  *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009).

In the case at bar, *all* of Relators' claims are premised upon Dr. Jackson "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval[,]" § 3729(a)(1)(A), and/or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim[.]"  § 3729(a)(1)(B).  To maintain a claim under § 3729(a)(1)(A), "a relator must prove three elements: 1) a false or fraudulent claim; 2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; 3) with the knowledge that the claim was false."  *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) (citation omitted), *overruled on other grounds by Glaser*, 570 F.3d at 910.  Meanwhile, to maintain a claim under § 3729(a)(1)(B), a relator must establish the following three elements: "1) the defendant made a statement in order to receive money from the government[;] 2) the statement was false[;] and 3) the defendant knew it was false."  *Id.* at 741 (citation omitted).  An "extra" element exists for FCA claims built upon purportedly false certifications of compliance with statutory or regulatory requirements, namely "that the certification of compliance be a condition of or prerequisite to government payment."  *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005).

11

A.      **Falsity of the Claim or Statement**

In order for a suit to meet the most basic requirement of the FCA, the underlying claims or statements must be false.  That is, they must represent a lie.  *Hindo*, 65 F.3d at 613.  "An example of a false statement in an invoice . . . is the representation that a resident worked five days a week at a hospital for a given quarter when he worked only three[.]" *Id*.

Common sense dictates that an inaccurate claim is not necessarily a false claim for purposes of the FCA.  *See Fowler*, 496 F.3d at 743.  This is especially true in regards to unremarkable or insignificant inaccuracies.  "[M]inor technical regulatory violations do not make a claim 'false' for purposes of the FCA[.]" *Gross*, 415 F.3d at 604 ("[T]he existence of mere technical regulatory violations tends to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made in order to deceive the government."); *Lamers*, 168 F.3d at 1020 ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.").

To discern the truth or falsity of a claim or statement, at least one statute or regulation must provide the backdrop of FCA litigation.  *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc. & NCS Healthcare, Inc.*, 460 F.3d 853, 858 (7th Cir. 2006) (citing and agreeing with the analysis of *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 438 (3d Cir. 2004) ("[I]f there is no requirement to adjust the [allegedly false] claim, there is no liability for a failure to do so.")).  Relators and Defendants agree that the primary section of the United States Code at issue in this case is that which addresses Medicare coverage and exclusions.  Said section states that "no payment may be made . . . for any expenses incurred for items or services – which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]"  42 U.S.C. § 1395y (West 2010)

12

(emphasis added).  Of course, as discussed *supra*, unique Medicare regulations govern some of the procedures and time frames at issue.

**B.      Submission or Presentment of the False Claim or Statement**

If a claim or statement is false as prescribed by the FCA, a relator has the burden of proving, in at least one instance, the submission of an *actually* false claim or statement if her *qui tam* suit is to survive summary judgment.  *See Crews*, 460 F.3d at 856 (citing *Quinn*, 382 F.3d at 440 ("Without proof of [submission of] an *actual* claim, there is no issue of material fact to be decided by a jury.  Quinn's theory that the claim'must have been' submitted cannot survive a motion for summary judgment.") (emphasis added)).  In other words, a relator must establish actual presentment of a false claim "*at an individualized transaction level.*"   *Fowler*, 496 F.3d at 742 (emphasis in original) (affirming dismissal of relators' FCA claims because they did not meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)).  One way in which a relator can make such an individualized, transactional showing is to provide the date, amount, contents, or payment of a false claim.  *United States ex rel. Tucker v. Nayak*, No. 06-cv-662-JPG, 2009 WL 1684484, at *4 (S.D. Ill. June 15, 2009).  The likelihood or probability of a false submission is simply not enough.  *Id*. at *3.

**C.      Knowledge of the Claim or Statement's Falsity**

With respect to the knowledge requirement of the FCA provisions at issue, innocent mistakes or negligence will not suffice.  *Hindo*, 65 F.3d at 613.  A defendant must "know" that a claim or statement is false by "ha[ving] actual knowledge of the information[,] act[ing] in deliberate ignorance of the truth or falsity of the information[,] or act[ing] in reckless disregard of its truth or falsity of the information[.]"  31 U.S.C. § 3729(b)(1)(A) (West 2010).  Again, "the claim must be a lie," and no intent to deceive or defraud the government is required.  *Hindo*, 65

F.3d at 613; § 3729(b)(1)(B).

### III.   Genuine Issues of Material Fact Exist for All of Relators' Claims

 The weight of the evidence as to the claims and their corresponding medical procedure will be analyzed in kind:

### A.   Lay Witness Testimony

The parties have been well-aware for several years that the merits of Relators' claims will be discerned from the medical records of the 25 trial patients.  This, in conjunction with the specific requirements of *Crews*[4] and *Fowler*, dictates that most of the largely inferential and circumstantial evidence and testimony of Turner, Swartos, and Cobin is of no consequence.

For example, Relators tout the fact that Dr. Jackson went from performing very few gonioscopies to billing several a day after he learned that a Medicare code existed for the procedure.  Even though Cobin *heard* Dr. Jackson call out gonioscopy results when he did not perform them, her inability to recall whether this fraud occurred during an examination of a trial patient is dispositive à la *Crews*' "single false claim" requirement.  As further example, Cobin's testimony that Dr. Jackson performed a "true"[5] extended ophthalmoscopy only 5% of the time that he billed for it does not present a genuine issue of material fact under the False Claims Act. The use of probability as the backbone to a False Claims Act suit has been denounced by *Crews*

---

[4]In terms of binding precedent, the Court finds the instant case most analogous to *United States of America ex rel. Crews v. NCS Healthcare of Illinois, Inc. & NCS Healthcare, Inc.*, 460 F.3d 853 (7th Cir. 2006).

[5]As Defendants point out, expert witness testimony, including that of Relators' own experts, severely discredit Cobin's statements about how an extended ophthalmoscopy "should" be performed.  Cobin's decision to lump, what she views to be, imperfect ophthalmoscopies in with those that were not performed casts doubt on the percentages that she cited.

and this Court.  Reliance on probability is even more tenuous in this case given the probe sampling at issue: 5 percent of the total patients billed for extended ophthalmoscopy could very well include all of the trial patients.  More importantly, with the exception of Patient 2 who is discussed *infra*, Cobin cannot identify the date, name of a patient, or amount billed for a false claim of extended ophthalmoscopy.  And, with respect to cataract surgeries and YAG laser capsulotomies, Cobin conceded that she never acted as a tech during the trial patients' examinations and that she could not state with certainty whether any of their operations were medically necessary.

Put simply, Relators' lay testimony largely does nothing to substantiate their claims when one considers the particular requirements of the False Claims Act.

### B.        Expert Witness Testimony

Despite a lack of direct evidence and on-point lay testimony, Dr. Dahl proves to be Relators' saving grace, at least at this stage in the litigation.[6]  The most damning conclusion he presents is that "in the [trial patient] records that [he] reviewed, 25 records, there are 10 specific incidences in the 25 records where the patient never showed up in the office yet there is documentation of a – a variety of things having been done[.]"  Doc. 159-4, p. 26.  Any claims billed to Medicare for these "no shows"  inherently demonstrate the elements of the False Claims Act.  Moreover, as Dr. Dahl testified, it casts doubt upon Dr. Jackson's medical judgment employed when the trial patients actually *did* make their appointments.  This testimony in itself is likely enough to preclude summary judgment on several of Relators' claims, but Dr. Dahl's findings do not stop there.  Thus, neither will the Court's analysis.

---

[6] The Court notes that it finds Dr. Dahl, Dr. Kamenetzky, and Dr. Williams to be competent to testify as experts during the summary judgment phase of this litigation.

15

### 1.    Count I

First, with respect to gonioscopies, Dr. Dahl opined that many of those performed on Patient 9 and Patient 25 lacked medical necessity.  Dr. Dahl also found that medical impossibilities surrounded the goniscopic records of some of the trial patients, including Patient 3.  Medical impossibility is a far cry from the scientific imporbability denounced in *Crews*. When Dr. Jackson billed for tests that resulted in medical impossibilities, he was either greatly confused or knowingly committing Medicare fraud.  Considering the multiple medical impossibilities that pop up in the trial patients' files, the Court concludes that the latter is a viable conclusion to draw.

While the opinions of Dr. Kamenetzky, Dr. Williams, and Dr. Jackson differ from those of Dr. Dahl, the Court must construe the evidence and draw all reasonable inferences in the light most favorable to Relators.  A jury could very well find Dr. Dahl to be the most credible expert witness and believe that Dr. Jackson lied about whether the trial patients' test results were medically necessary for purposes of Medicare.  For these reasons, a genuine issue of material fact exists regarding Count I, and summary judgment is inappropriate.

### 2.    Count II

Next, Dr. Dahl disagrees with the medical necessity of many of the extended ophthalmoscopies that Dr. Jackson purportedly conducted.  Namely, he found only three to be properly billed to Medicare.  Dr. Dahl points to the file of Patient 7, who underwent ten extended ophthalmoscopies over a two-year period, as most indicative of fraud.  The Court understands that Dr. Dahl and Dr. Jackson may view the necessity of an extended ophthalmoscopy somewhat differently, and this is certainly understandable given the general deference to medical judgment. But, the record, especially Dr. Dahl's testimony as to Patient 7, illustrates that Dr. Jackson was

performing extended ophthalmoscopies almost as a matter of course.  Medicare does not allow payment for all procedures that a physician deems reasonable in the treatment of his patient.  A procedure must also be *necessary*.  42 U.S.C. § 1395y (West 2010).

The potential impropriety of extended ophthalmoscopy billing is bolstered by Dr. Kamenetzky, who found other procedures performed on trial patients to not be necessary, and Cobin, who testified that the procedure was not properly performed on Patient 2 despite a corresponding claim's submission to Medicare.  The conspicuous absence of the requisite retinal drawings for Patients 7, 14, and 22 also raises eyebrows as to whether an extended ophthalmoscopy was even performed on those patients.[7]  In light of the foregoing, it is possible that Dr. Jackson billed Medicare for extended ophthalmoscopies he did not perform.  A genuine issue of material fact therefore exists for Count II.

### 3.    Count III

Dr. Dahl also opined on the lack of medical necessity for many of the cataract surgeries performed on the trial patients; specifically, he found that 25 of the 36 surgeries were not medically necessary due to an absence of refraction determination and a lack of visual acuity loss and improvement after surgery.  While Defendants emphasize that these factors are not contemplated by the applicable cataract surgery regulation, ILMI-070 cites one key consideration as "[h]istory of a visual function problem, which, after ophthalmic evaluation suggests the expectation of cataract surgery, will improve the visual function status commensurate with the risk of undergoing surgery."  Doc. 136-1, p. 4.  Contrary to Defendants' assertion, the Court finds Dr. Dahl's concerns fit within this broad provision of ILMI-070.  Dr.

---

[7]The Court finds the absence of three drawings in a probe sample of just 25 patients to rise above unactionable regulatory violations as discussed in *Gross*.

Dahl's belief that more than two-thirds of cataract surgeries were inappropriate dispels the notion of a mere difference in medical opinion and creates a genuine issue of material fact as to whether medical records were falsified to induce payment by Medicare.  This understanding is supported by the aforementioned "no show" patients for whom Dr. Jackson billed Medicare.  Therefore, summary judgment on Count III is not warranted.

### 4. Count IV

Apart from a brief footnote, Defendants do not seriously dispute Relators' claim that YAG laser capsulotomies were inappropriately scheduled outside of the 90-day global billing period.  Turner testified that Dr. Jackson told her and others that capsulotomies should be scheduled 100-110 days after a patient's cataract surgery "just to be on the safe side."  Doc. 159-6, p. 15.  Although it does not appear that this testimony is in the context of the probe sample, the Court has no reason to believe that Turner was not discussing the trial patients as well.  Summary judgment on Count IV would be inappropriate.

### 5. Count V

Finally, Dr. Dahl testified that Defendants wrongfully billed several YAG laser capsulotomies to Medicare because, like the cataract surgeries, there was an absence of refraction determination and a lack of visual acuity loss and improvement after surgery.  As Defendants point out, Dr. Dahl's opinion is somewhat undercut by the fact that his capsulotomy testimony hinged on a regulation that the parties have since stipulated is no longer applicable to this case.  The Court, however, will not be so brash as to allow a post-deposition stipulation to fully discredit Dr. Dahl's testimony.  Dr. Dahl took issue with many of Dr. Jackson's claims for all four procedures, and there is no reason to believe that he would not come to the same or similar conclusions regarding capsulotomies under the now-applicable ILMI-013.  Moreover,

18

Dr. Dahl's ultimate opinion – that several of the capsulotomies were not medically necessary – is properly premised upon the "baseline" Medicare statute, 42 U.S.C. § 1395y, that requires reasonableness and necessity.  A reasonable inference can also be made that Dr. Jackson's general encouragement of scheduling capsulotomies as a matter of course improperly produced the trial patients' follow-up rate of 100%.  In sum, the Court finds a genuine issue of material fact exists as to whether Defendants fraudulently induced patients to undergo unnecessary capsulotomies.  Count V will continue.

## IV.    Motion for Sanctions

As a final matter, the Court takes up Defendants' motion for sanctions.  Pursuant to Federal Rule of Civil Procedure 11 (hereinafter "Rule 11"), Defendants request sanctions due to the perceived frivolity of Relators' second amended complaint.  The primary purpose of Rule 11 is to deter unnecessary complaints and other filings throughout litigation.  Fed. R. Civ. P. 11 advisory committee's notes; *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998).  When filing a pleading, written motion, or other paper with the court, a party certifies that, to the best of his knowledge, his claims/defenses are warranted by existing law and that his factual contentions hold evidentiary support.  Fed. R. Civ. P. 11(b)(2)-(3).  In an effort to inhibit abusive litigation strategy, the Seventh Circuit applies a frivolousness test when considering Rule 11.  "An attorney takes a frivolous position if he fails to make a reasonable inquiry into facts (which later prove false) or takes a position unwarranted by existing law or a good faith argument for its modification."  *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1122 n.67 (7th Cir. 1992) (quoting *Magnus Elecs. Inc. v. Masco Corp.*, 871 F.2d 626, 629 (7th Cir. 1989)).

The Seventh Circuit has widely held that Rule 11 requires the application of an objective standard of reasonableness under the circumstances.  *Pac. Dunlop Holdings, Inc. v. Barosh*, 22

F.3d 113, 118 (7th Cir. 1994). Courts are "expected to avoid the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed. R. Civ. P. 11 advisory committee's notes.

Here, as perhaps best evidenced by the fact that this case will continue towards trial, Relators' claims are warranted by applicable law and their factual contentions hold at least some evidentiary support. While Relators' general argument that *all* of the bills submitted to Medicare for the trial patients has proven somewhat disingenuous, the Court does not find Relators' counsel took an objectively frivolous position at the time he filed the second amended complaint. The request for sanctions shall be denied.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 144). Further, the Court **DENIES** Defendants' Motion for Oral Argument (Doc. 162) insofar as it seeks oral argument on said summary judgment motion. The Court **RESERVES RULING** on the oral argument motion insofar as it seeks oral argument on the parties' other pending motions. Finally, the Court **DENIES** Defendants' Motion for Sanctions (Doc. 168, 169).

**IT IS SO ORDERED.**
**DATED: January 4, 2011**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

20